EDWARD W. FRAIZER et al., Appellees, v. MARY FRAIZER, Appellant.

HUSBAND AND WIFE: Marriage Settlements—Antenuptial Contract
1 —Proof. Record held to establish, by copy, an antenuptial contract, the original being lost. (See Book of Anno., Vol. 1, Sec. 11990, Anno. 71 *et seq.*)

HUSBAND AND WIFE: Marriage Settlements—Antenuptial Contract
2 —Effect on Homestead Occupancy. An antenuptial contract under which the wife agrees to accept a named fractional part of the husband's property in case she survives, does not have the legal effect of depriving her of her statutory right to occupy the homestead, *free of all rent*, until her share is actually set off to her or otherwise actually disposed of. (See Book of Anno., Vol. 1, Sec. 11923, Anno. 9 *et seq.*)

Headnote 1: 30 C. J. p. 669. Headnote 2: 29 C. J. p. 999 (Anno.)

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

MARCH 16, 1926.

REHEARING DENIED JUNE 21, 1926.

SUIT in partition of real estate. The plaintiffs averred that the defendant was the owner of an undivided one fifth of

the real estate, and that the plaintiffs were owners each of an undivided one fifth thereof. The defendant presents the contention that she is the owner of one third thereof, as the surviving widow of the deceased. The trial court found the issue with the plaintiffs, and entered decree accordingly. Defendant appeals.—*Modified and affirmed.*

*C. C. Putnam* and *Guy S. Calkins,* for appellant.

*Dale & Harvison,* for appellees.

EVANS, J.—I. The real controversy between the parties is centered upon an antenuptial contract. The plaintiffs are the four children of A. L. Fraizer, deceased. The defendant is his surviving widow; she is not the mother of his children. The plaintiffs pleaded an alleged antenuptial contract between their father and the defendant, whereby it was agreed that, in the event that the defendant should survive the decedent, she should take a one-fifth share of his estate, and no more. The issue thus tendered was met by the defendant with a general denial. She introduced evidence, however, tending to show that such alleged contract had been destroyed by the decedent in his lifetime, with intent to abrogate the same. The defendant also pleaded a prior suit pending, brought by herself, as plaintiff, against these plaintiffs, as defendants, and praying that her distributive share be set apart. She prayed in her answer that such suit be consolidated with the present case. No consolidation appears to have been had. Nothing appears in this record to indicate the state of the pleadings or of the proceedings in the suit referred to. The controversy litigated herein is essentially one of fact. As the plaintiffs make the case, stated briefly, the defendant and the decedent were married at Quill Lake, Canada, in January, 1916, and lived together as husband and wife until his death, in July, 1922. The deceased was a widower, and the defendant a widow. Each had children by the former marriage, and each had property. Mrs. Horner, daughter of the decedent, lived in the vicinity of Quill Lake, Canada, and her father visited her

1. HUSBAND AND WIFE: marriage settlements: antenuptial contract: proof.

there.  Upon the invitation of Mrs. Horner, the defendant herein visited her at the same time.  Both were guests at the Horner home for a period of one month following Christmas, 1915, at the end of which time the marriage took place.  That antenuptial property arrangements were considered and discussed freely at the Horner home by Mrs. Horner (if not *with* her), is without dispute.  Two weeks before the marriage, a formal instrument had been prepared by the notary public, who was a member of a firm of barristers at Quill Lake.  This instrument was prepared in quintuple, and at least one copy thereof was taken by the decedent to the Horner home.  The execution of the instrument by the parties thereto occurred in the office of the barristers.  The marriage occurred in the same place, and on the same day.  The original was first taken by the decedent and kept by him.  After the marriage, the married couple took up their residence at the home of the decedent in the near vicinity of Des Moines, and there continued until his death.  The original instrument carrying the signatures of the parties was not produced at the trial.  It was traced from the hands of the decedent into the hands of the witness Burkett, a banker, in whose custody it remained for some time.  Thereafter, it was taken by the decedent and left in the custody of Mr. Sullivan, formerly an attorney in Des Moines, and now deceased.  This was done in the presence of one of the sons of the decedent.  After the death of the decedent, members of the family sought to obtain the contract from Mr. Sullivan, who, however, was unable to find the same.  The evidence does not show the detailed extent of the search for the instrument.  It does appear, however, that none of the plaintiffs herein had possession or control thereof.  It also appears that the office of Mr. Sullivan, which was in the Clapp Block, was destroyed by fire.  It does not affirmatively appear that the instrument was destroyed thereby.  The plaintiffs procured what they claimed to be one of the quintuple copies, and attached the same to their petition as an exhibit, and introduced the same as secondary evidence of the lost instrument.

As against the foregoing, the defendant testified that she signed certain papers in the office of the barristers, at the direction of the notary; that she did not know the contents

nor the purport thereof; that she did not inquire as to their contents. Her excuse for her conduct is that she was embarrassed. She testified, also, that her signing was done after the marriage ceremony was performed, and not before. The defendant was not an ignorant woman; neither was she inexperienced. For four years prior to her marriage, she had been a traveling saleslady for a commercial house. For seven years prior to such employment, she had managed a rooming house. She was not deficient in ability to read or to write. She was, at the time, about 47 years of age, and does not appear to have been under physical disability of any kind. The copy presented by the plaintiffs was upon paper which carried the printed professional card of the firm of barristers in whose office the original contract was prepared and signed. Its close resemblance to the paper or papers signed by the defendant was conceded by her as a witness. Other witnesses · identified the copy as one of the duplicates originally made by the notary. The testimony of Mrs. Horner, to the effect that the contents of the contract were freely discussed, has significant corroboration in the testimony of the defendant herself, who testified as follows:

"* * * I had a conversation with Mrs. Horner about my approaching marriage to her father, but nothing was said about a ·contract that I would be called upon to sign. She asked me if I would go equal shares with the children. I didn't know and I didn't learn what was meant by that. I can't remember that anything was said in my talk with her about having a contract to that effect, but I do remember that it was talked between us that I would go in equal shares with Mr. Fraizer's children. I understood he had four children."

Though the defendant's evidence has the· corroboration of one witness to the effect that the signing of the contract was done after the marriage ceremony, and not before, yet several other witnesses who were present testified that the signing was done before the ceremony, and not afterward. On that question the evidence preponderates strongly against the defendant. Upon the whole record, the question of fact presented at this point is not open to reasonable doubt. We reach the ready conclusion, as did the district court, that an antenuptial contract was

voluntarily executed by the parties, and that the copy presented by the plaintiffs is a true copy thereof. Nor have we any reasonable doubt that it was executed before the marriage, as it was intended to be, and not afterward.

We hold, therefore, that the decree entered below, in so far as it established the extent of defendant's share in the estate of her deceased husband as one fifth thereof, was correct, and should be affirmed. Another phase of the controversy remains to be considered.

II. The property in controversy comprises 16 acres of land, including the homestead of the decedent. The entire property has been occupied by the defendant since the decease of her husband. She had previously elected not to claim the homestead in lieu of her distributive share. The plaintiffs prayed that she be charged with rent for the homestead occupied by her, from the date of her formal election. The court so decreed. Complaint is made of this feature of the order. We think the complaint is well taken. Under Section 2985, Code of 1897, the widow is entitled to occupy the homestead until it is otherwise disposed of according to law. Unless the antenuptial contract had the legal effect of depriving her of this statutory right, then she was not chargeable with rental for such occupation. In *In re Estate of Johnson*, 154 Iowa 118, we held that an antenuptial contract may not supplant the power of the court, under the statute, to award to the widow a year's support. See, also, *In re Estate of Uker*, 154 Iowa 428.

2. HUSBAND AND WIFE: marriage settlements: antenuptial contract: effect on homestead occupancy.

That the same rule should be applied to the statutory right of the widow to the temporary occupancy of the homestead is indicated in *In re Estate of Adams*, 161 Iowa 88. These statutory provisions are deemed to be in the interest of the family, and to involve a public policy.

The statute provides that a *"setting off"* of the share of the widow shall be a sufficient disposal of the homestead to terminate the widow's right of occupancy thereof. The appellees contend that the *election* of the widow to take her share in lieu of homestead operates instanter as a disposal of the homestead. As authority for this proposition, *Voris v. West*, 180 Iowa

138, is cited and relied on. An examination of that case does not justify the contention. The specific language in the opinion relied on is the following (page 142):

"* * * and it [homestead] is so disposed of when the survivor *elects* to take a distributive share in the entire property of the deceased spouse."

From the foregoing, appellees argue that the right of occupancy of the homestead terminates when the widow *elects,* and not when her share is *set off.* The remark thus made by the writer of the opinion was an incidental one, made in the course of argument which had no reference whatever to the question now before us. That there was no intent to qualify or construe the phraseology of the statute itself is indicated later in the same opinion by the following statement (page 144):

"The homestead right passes to her, and with it the right to continue to possess and occupy the whole homestead until otherwise disposed of, according to law. The *setting off* of the distributive share to the wife is such a disposition."

Under the terms of the statute, the *"setting off"* is what constitutes a disposal, and the opinion in *Voris v. West,* supra, is not to be otherwise construed. A *"setting off"* is a prerequisite to occupancy by the widow of her own distributive share.

We are of opinion, therefore, that the widow was entitled to occupy the homestead rent-free until there should be a "setting" apart of her share, or other disposal of the homestead. Whether she is entitled to occupy the entire tract of land, we do not decide. The record furnishes us no data as to the area of this particular homestead, as such, and such question is reserved from the adjudication.

To the extent here indicated, the decree below will be modified. In all other respects, the decree is affirmed. The cause, however, will be remanded for further proceedings consistent herewith.—*Modified and affirmed.*

DE GRAFF, C. J., and ALBERT and MORLING, JJ., concur.